**Robert D. FERGUSON and Ralph Milo, Plaintiffs,**

v.

**LION HOLDING, INC., Defendant.**

**Robert D. Ferguson and Milo Family Limited Partnership, Plaintiffs,**

v.

**Hannover Rückversicherungs– Akteiengesellschaft, Defendant.**

**Nos. 02 Civ. 4258(PKL), 02 Civ. 4261(PKL).**

United States District Court, S.D. New York.

March 1, 2007.

Willkie Farr & Gallagher, Francis J. Menton, Jr., New York City, for Plaintiffs.

Clifford Chance U.S. LLP, Steven C. Schwartz, James M. Ringer, Thomas Teige Carroll, New York City, for Defendants.

## OPINION AND ORDER

LEISURE, District Judge.

In 1999 defendant Hannover Rückversicherungs–Akteiengesellschaft ("Hannover" or "defendant"), a German reinsurance company, purchased defendant Lion Holding, Inc. ("Lion"). Lion was an insurance holding company whose principal asset was Clarendon Insurance Group, Inc. ("CIGI"). The purchase was executed pursuant to a Stock Purchase Agreement dated February 16, 1999 (the "SPA"). Both plaintiffs are former senior officers of CIGI and were the majority shareholders of Lion prior to the sale; they continued to work for CIGI post-acquisition pursuant to cer-

tain employment agreements, which were later modified by a letter agreement dated March 5, 1999 (the "Letter Agreement"). (Carroll Aff. Ex 6 (hereinafter "Letter Agreement").)

This action arises out of plaintiffs' claim that Hannover breached a term of the Letter Agreement that obligated Hannover to pay plaintiffs certain deferred compensation in the event CIGI met certain underwriting goals between 1999 and 2001. While plaintiffs were paid deferred compensation in the amount of $25 million, they claim that they are entitled to the full $100 million payment contemplated by the provision. Defendant Hannover now moves for partial summary judgment, arguing that plaintiffs failed to meet requirements in the Letter Agreement that would have made them eligible for payment of the entire $100 million, thus foreclosing their claims as a matter of law. For the reasons set forth below, Hannover's motion is GRANTED in part and DENIED in part.

## BACKGROUND

I. *Defendant's Asserted Undisputed Material Facts*

A. *The Earnout*

Hannover purchased Lion, which owned CIGI, from Lion's shareholders in 1999 pursuant to the SPA. (Def.'s 56.1 ¶¶ 1–2.) At that time, Lion also entered into Amended and Restated Executive Employment Agreements with plaintiffs Robert D. Ferguson and Ralph Milo (the "Employment Agreements"). (Def.'s 56.1 ¶ 3.) Section 2.3 of the SPA and section X of the Employment Agreements provide for the payment to plaintiffs of certain deferred compensation, collectively known as the

"Earnout."[1] (Def.'s 56.1 ¶ 4.) The terms of the Earnout provide that plaintiffs could earn up to $25 million each year for 1999, 2000, and 2001, and an additional payout for those years combined, resulting in a final amount of up to $100 million. (Def.'s 56.1 ¶ 5.) The Employment Agreements call for any payment of the Earnout to be made on or before May 15, 2002. (Carroll Aff. Ex. 1 at Ex. B, § 2.)

Under the SPA and the Employment Agreements, the Earnout is based on CIGI's "Combined Ratio" for 1999, 2000, and 2001, and also based on a "Weighted Average Combined Ratio" for the three years combined. (Def.'s 56.1 ¶ 6.) The Combined Ratio is the sum of CIGI's Net Expense Ratio and CIGI's Net Loss Ratio.[2] (Def.'s 56.1 ¶ 7.) If the Combined Ratio was 80% or greater in any Earnout year, defendant owed no Earnout; if the Combined Ratio was between 75% and 80%, defendant owed a partial Earnout; and if the Combined Ratio was 75% or less, defendant owed the maximum Earnout for that year. The final Earnout payment is calculated in the same manner, except that it is based on a weighted average of CIGI's Combined Ratio for the three individual years. (Def.'s 56.1 ¶ 8.)

The parties agree that CIGI's Combined Ratio for 1999 was 67.7%, and, accordingly, defendant paid the full $25 million Earnout payment for that year. (Def.'s 56.1 ¶ 9; Pl.'s 56.1 ¶ 9.) However, the parties disagree as to whether the Earnout payment obligation has been triggered for the other three time periods: defendant claims that CIGI's Combined Ratio for 2000 and 2001 was 101.6% and 82.2%, respectively, and the weighted three-year average was 82.6%. Consequently, Hannover has not paid plaintiffs any additional Earnout payment.

### B. The Letter Agreement and Its "Special Operating Rules"

The Letter Agreement entered into by defendant and Messrs. Ferguson and Milo amends certain terms of their prior agreements[3] by providing "Special Operating Rules" regarding the Earnout. (Def.'s 56.1 ¶ 11.) These rules were included because the parties understood that as plaintiffs would continue to "operate [CIGI] after closing" they would be expected to work toward achieving "both the Combined Ratio necessary to trigger payment of the earn-out and a level of profits reflecting an adequate return on Hannover Re's investment." (Letter Agreement 2.) The Special Operating Rules are "designed to reconcile" any conflict that might arise should plaintiffs be asked to effectuate Hannover board decisions or take action in running the company that might negatively impact plaintiffs' ability to achieve the Combined Ratio necessary to trigger payment of the Earnout. (Letter Agreement 2.)

The operational rules are broken into two key provisions,[4] sections 5(b) and 5(c). Section 5(b) provides the general rule that "Management [i.e., plaintiffs] shall be obligated to comply with the decisions of

---

1. The SPA and Employment Agreement also provide for the payment of other deferred compensation. These other provisions, however, are not pertinent to this motion.

2. Each of these capitalized terms is defined in more detail in the relevant contract documents.

3. The parties do not dispute that the Letter Agreement properly modified the SPA, and the Court agrees.

4. The Court will refer to plaintiffs' ability to object to certain board decisions under either section of the Special Operating Rules interchangeably as the "objection function" or "disagreement function."

[CIGI's] board of directors. However, if management disagrees with any decision of the board of directors regarding retentions,[5] new programs or inter-company expense allocations, then the effect of such decision shall be eliminated only for purposes of calculating [the Earnout]." (Letter Agreement 2–3; Def.'s 56.1 ¶ 12.) Section 5(c) then sets forth more specific rules governing the level of reserves carried by Hannover or its subsidiaries, including CIGI, to cover future liabilities:

> (i) If management disagrees with the level of reserves carried by the Insurance Subsidiaries for any of the accounting periods ending December 31, 1999, 2000, or 2001, then they may give notice to Hannover Re that they demand a neutral determination of the appropriate level of carried reserves for the relevant period
>
> . . .
>
> (ii) If management objects with the level of reserves als [sic] provided above, then the level of reserves shall be established by a neutral expert chosen substantially in the same manner as the party chosen to resolve any disagreement concerning the Closing Reserve Statements in accordance with the last paragraph of Section 5.19.

(Letter Agreement 3; Def.'s 56.1 ¶ 13.) The rules go on to state that the parties assume that the insurance subsidiaries will have an average retention level of between ten and fifteen percent. (Letter Agreement 3.) It then sets out two illustrative examples of the application of the general rule:

> The following two examples help illustrate the general rule. First, if management wishes to retain only 5% of the risk on a particular book of business, and the board of directors decides that the relevant Insurance Subsidiary must retain 15%, then the effect of the Insurance Subsidiary's retention of the additional 10% shall be excluded from the calculation of each Shareholder Item, whether or not the exclusion hurts or benefits management. As a second example, the board of directors shall be free to direct that certain expenses and other charges be allocated from Hannover Re to the Company for financial statement purposes. However, management may disagree with any of these allocations, in which case their effect would not be included when the Shareholder Items are calculated.

(Letter Agreement 3.) [6]

### C. *The Parties' Correspondence*

Certain correspondence referencing the Special Operating Rules followed the execution of the Letter Agreement. Defendant points first to an email sent by Ferguson to Hannover on November 29, 2000, which noted that, "[a]s written, [the Spe-

---

**5.** Defendant defines "retention" as " 'the portion of the risk that the ceding insurer retains or assumes for its own account. In other words, a retention is that portion of the risk of loss that is not reinsured.' " (Def.'s Mem. Supp. Summ. J. 2 n. 1 (quoting Barry Ostrager & Mary Kay Vyskocil, *Modern Reinsurance Law and Practice* § 1.03 (2d ed.2000)).)

**6.** While not relevant to the considerations before the Court here, the Letter Agreement does also state that "[s]uch eliminations [of Hannover board decisions for purposes of calculating the Earnout] (but only in the case the elimination would improve the Shareholder Items) shall be made only if the Company's combined gross written premium income ('GWPI') in such year exceeds $1.4 billion." (Letter Agreement 3.) The parties agree that the GWPI for each year exceeded $1.4 billion. In addition, the Letter Agreement states that in the event of a conflict between its terms and that of the SPA or any other operative document, the terms of the Operating Rules in the Letter Agreement shall control. (Letter Agreement 3.)

cial Operating Rules] contemplate the rather awkward process of the Clarendon board voting to increase retentions, with Ralph and I formally disagreeing." (Def.'s 56.1 ¶ 15.) Defendant next points to a letter sent to defendant February 5, 2001, in which Ferguson invoked plaintiffs' rights under the Letter Agreement to object to "the Board's decision to cause Clarendon to enter into the new deal with Acceptance and ICH." (Def.'s 56.1 ¶ 17(a).)

In a letter dated July 17, 2001, Ferguson wrote to Herbert Haas, Hannover's CEO and the Chairman of its Board of Directors, to request

> a schedule of any changes in retentions or inter-company expense allocations made or contemplated to be made during the year 2001. As you know[,] under Section 5(b) of the side letter dated March 5, 1999, we have the right to disagree with changes in these items. In order to know whether to register an election to exclude such items, I of course must know what the items are.

(Def.'s 56.1 ¶ 16.) On September 19, 2001, Ferguson wrote a letter to defendant informing it that "I hereby give formal notice pursuant to Section 5(c)(i) of the Letter Agreement dated March 5, 1999 . . . that management . . . disagrees with and objects to the level of carried reserves for the year ending December 31, 2000." (Def.'s 56.1 ¶ 18(a).) By letter dated September 20, 2001, Ferguson stated that he and Milo

> formally object[s] to any indemnity claim which arises in whole or in part

from losses occurring on or after July 1, 1999, on Clarendon policies issued by Eton Management and further formally object to the inclusion of any loss resulting from the write-off of the reinsurance recoverable associated with the premium portfolio transfer in the calculation of both the earn-out and of the management bonuses.

(Def.'s 56.1 ¶ 17(c).) Finally, on September 21, 2001, Ferguson advised defendant by written letter that he "formally object[s] to any claim which Hannover Re has made against the Selling Shareholders arising out of these delinquent reinsurance recoverables and to the inclusion of any related incurred loss provision for purposes of calculating both the earn-out and the management bonuses." (Def.'s 56.1 ¶ 17(d).)

## II. Plaintiffs' Responses to Defendant's Alleged Undisputed Material Facts

### A. CIGI's Unique Business Model

Plaintiffs allege that, prior to its acquisition, CIGI had a unique business model, known in the insurance industry as a "program company."[7] (Pl.'s 56.1 ¶ 27.) Plaintiffs argue that information about CIGI's business model is important to this action because the way in which CIGI ceded commissions resulted in a situation where CIGI's Combined Ratio had typically been lower than its industry peers'.[8] (Pl.'s 56.1 ¶¶ 37–38.) Thus, plaintiffs claim that the Combined Ratio numbers agreed upon for calculation of the Earnout were based on CIGI's continued use of the program com-

---

**7.** A program company acts primarily as an intermediary between the originators of insurance policies and reinsurers. (Pl.'s 56.1 ¶ 27.) Its "fundamental characteristic" is that it assumes much less insurance risk than a traditional insurance company by "ceding" a large amount of the underlying premium on any given policy to a reinsurer. (Pl.'s 56.1 ¶¶ 27–28.) The principal source of revenue

for a program company is the commission that it receives for acting in its intermediary role. (Pl.'s 56.1 ¶ 30.)

**8.** For example, plaintiffs allege that, in 1999, the insurance industry's aggregate combined ratio was 107.9%, while CIGI's was significantly lower at 74%. (Pl.'s 56.1 ¶ 38.)

pany business model; "the earn-out could be wiped out in its entirety by shifting the business model to that of a conventional insurance company." (Pl.'s 56.1 ¶ 48.)

### B. *Hannover's Alleged Changes to CIGI's Financials*

In late 2000, Hannover notified plaintiffs that it intended to alter CIGI's business model such that CIGI would begin taking greater insurance risk (or, in insurance parlance, greater "retentions"). (Pl.'s 56.1 ¶ 56.) Plaintiffs state that Mr. Ferguson alerted defendant of their concerns about this decision and its potential impact on the calculation of the Earnout in the same November 29, 2000 email referenced by defendant in its Rule 56.1 statement. (Pl.'s 56.1 ¶ 57.) Plaintiffs point to a section of that email not mentioned by defendants, where Mr. Ferguson agreed that he and Mr. Milo would follow the board's directions, but that they could not "ignore the effect of increased net retention on the formula for calculating [their] earn-out under the Stock Purchase Agreement." (Pl.'s 56.1 ¶ 57.) Mr. Ferguson also suggested in that email that the parties meet to discuss how to better align their incentives. (Pl.'s 56.1 ¶ 57.) In February 2001, CIGI's accounting department provided Hannover with a draft set of its financials, which contained an unadjusted combined ratio slightly over 80%. (Pl.'s 56.1 ¶ 58.) Plaintiffs state that, thereafter, Hannover began to alter its financials so as to drive up the combined ratio, which reached as high as 101%. (Pl.'s 56.1 ¶¶ 59–62.) Plaintiff provides a number of examples of these changes to the Hannover financials. (Pl.'s 56.1 ¶¶ 60–61, 67, 70–72, 75–80.)

In March 2001, Ferguson was told that he would no longer need to come to the office and, accordingly, his last day was March 7, 2001. (Pl.'s 56.1 ¶ 63.) At around the same time, Milo was told by Hannover that while he could continue to come to his office, his services "were not really needed, and I could take long vacations if I wished." (Milo Aff. ¶ 23.) Milo's employment terminated pursuant to his Employment agreement on December 1, 2001. (Milo Aff. ¶ 23.) Between March and December 2001, Milo alleges he was "cut ... out of discussions as to business model and detailed accounting." (Pl.'s 56.1 ¶ 65.)

On July 17, 2001, Ferguson asked Hannover to provide him with a schedule of any changes in retentions or intercompany expense allocations already made or to be made during 2001. (Pl.'s 56.1 ¶ 69.) According to plaintiffs, defendant provided them with inaccurate information. (Pl.'s 56.1 ¶¶ 70–71, 73.) Only after bringing suit did plaintiffs learn that Hannover, in their view, had altered CIGI's traditional business model for the purpose of disadvantaging the Earnout calculation. (Pl.'s 56.1 ¶¶ 73, 75–81; *see also* Pl.'s Mem. Opp'n Summ. J. at 13.)

### C. *Plaintiffs' View of the Special Operating Rules' Requirements*

As for the Special Operating Rules in the Letter Agreement, plaintiffs state that they "mention no procedure for registering disagreement, no requirement for formality, no requirement for a writing of any kind, and no required time period." (Pl.'s Mem. Opp'n Summ. J. at 1–2.) Consequently, plaintiffs disagree with defendant that certain assertions in defendant's Rule 56.1 statement are undisputed. Specifically, plaintiffs dispute (1) that any of Ferguson's correspondence with Hannover served as a formal objection under section 5(b) (Pl.'s 56.1 ¶ 17); (2) that they were obligated to "pursue[ ] the dispute resolution mechanism set forth in the Rules for disagreements regarding the appropriate level of reserves" pursuant to section 5(c)

(Pl.'s 56.1 ¶ 18); and (3) that they failed to properly disagree with Hannover's retention adjustments (Pl.'s 56.1 ¶ 19).

## III. *The Parties' Claims*

The key question before the Court on this motion is whether plaintiffs' claims that defendant improperly calculated the Earnout—they argue that defendant failed to exclude from its calculations of the Combined Ratio certain Hannover board decisions—are precluded as a matter of law.

### A. *Defendant's Claims*

Defendant argues that plaintiffs' objections to certain board decisions are foreclosed as a matter of law because plaintiffs failed to comply with a requirement in the Special Operating Rules that any objections made with the intention of excluding board decisions from the Earnout calculation be made "formally" and in a timely manner. Accordingly, defendant believes its computation of the relevant Combined Ratios was proper, and that it did not breach an obligation to pay plaintiffs the full Earnout because such obligation never arose.

Defendant impliedly concedes that sections 5(b) and 5(c) of the Letter Agreement are ambiguous with respect to the mechanics and requirements of the dispute function. (Def.'s Mem. Supp. Summ. J. at 9–11.) Defendant argues, though, that while the plain terms of sections 5(b) and 5(c) may be ambiguous on their face, relevant extrinsic evidence "leaves no question that they understood that formal objections were required to invoke the Special Operating Rules." (Def.'s Mem. Supp. Summ. J. at 11.)

Defendant's argument, which relies heavily on plaintiffs' written communications to defendant in which they registered objections to certain board decisions after the Letter Agreement had been executed, is that plaintiffs understood that the Special Operating Rules required them to "formally" disagree in a timely manner with any board decisions that they sought to have excluded from the Earnout calculation. Because they failed to do so, plaintiffs' disagreements and the corresponding requested adjustments to the Combined Ratio should be rejected as a matter of law.

### B. *Plaintiffs' Responses*

Plaintiffs agree that the terms of sections 5(b) and 5(c) are ambiguous on their face. They argue, though, that questions of fact exist as to what the parties intended the requirements and mechanics of the disagreement function to be. In their view, resolution of the meaning of these sections is not sufficiently clear for resolution on summary judgment; instead, they believe it a question of law for the Court to make before the subsequent questions of whether plaintiffs' actions satisfied the requirements of the section and, if so, whether defendant's calculations breached the Letter Agreement. Plaintiffs claim that the parties never intended for plaintiffs to "formally" or "timely" disagree with a Hannover board decision in order for that decision to then be excluded from the calculation of the Earnout.[9]

---

**9.** In their memorandum of law in opposition to defendant's motion, plaintiffs actually state that the February 5, 2001, letter was sent "pursuant to section 5(b)" (Pl.'s Mem. Opp'n Summ. J. at 18); however, they state in their Rule 56.1 counterstatement that it and other communications do not constitute " 'formal objections' " (Pl.'s 56.1 ¶ 17). They further argue in their brief that the September 19, 2001, letter was sent pursuant to section 5(c), while the September 20 and 21, 2001, letters objected to subjects not governed by the Letter Agreement. (Pl.'s Mem. Opp'n Summ. J. at 18.)

■ Further, plaintiffs argue that, even if the Court were to find that section 5(b) required them to provide defendant with notice of a disagreement, genuinely triable issues exist as to whether they complied with such a requirement, and whether the objections they made in letters and emails prior to this lawsuit meet any requirements that might exist under the Letter Agreement's Special Operating Rules. They also claim that a genuinely triable issue exists as to whether providing notification according to section 5(c) was a condition precedent to defendant's duty to exclude the decision from the Earnout calculation, or an independent promise by plaintiffs to perform.[10] (Pl.'s Mem. Opp'n Summ. At J. 19–20.) Consequently, plaintiffs argue, all of their objections to Hannover board decisions are valid.

Plaintiffs also claim that their failure to previously disagree with certain Hannover board decisions does not preclude those disagreements now. This is so, they say, because Hannover undertook efforts to hide certain decisions from plaintiffs that would have—and did—materially affect the Earnout, efforts plaintiffs claim they only learned of through this litigation. Finally, they claim that, given defendant's malicious intentions in tampering with CIGI's financials, they are entitled to lodge disagreements with certain board decisions outside of the scope of the types of decisions included in section 5(b) and (c) because defendant breached the covenant of good faith and fair dealing implied in their contracts in making those decisions.

### C. The Hannover Board Decisions at Issue

Plaintiffs point in their complaint in this action [11] (Compl. ¶¶ 19, 23–24; Carroll Aff. Exs. 20, 23 at 8), and in an expert report prepared for this litigation [12] (Carroll Aff. Ex. 24 at 12–23) to certain Hannover board decisions they claim defendant did not properly exclude from calculation of the Earnout. Some of these board decisions were the subject of correspondence between the parties, and some were raised only through this litigation.

Defendant did not submit a complete and comprehensive list of those adjustments it believes the Court should consider in this motion. Both parties do, however, describe in their submissions six proposed adjustments, which are the largest and would thus have most significantly impacted defendant's calculation of the Earnout if made. (Def.'s Mem. Supp. Summ. J. at 7; Pl.'s Mem. Opp'n Summ.

10. Only in its reply papers does defendant offer an affirmative argument that the disagreement function was neither intended to be a condition precedent nor an independent promise, but, instead, a right, akin to an option, that plaintiffs have waived by failing to timely exercise it. (Def.'s Reply Mem. Supp. Summ. J. 5–6.) Because defendant only raised this argument in its reply papers, the Court will not consider it. *See Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir.1999); *United States v. Gigante*, 39 F.3d 42, 50 n. 2 (2d Cir.1994) ("Arguments may not be made for the first time in a reply brief.") modified on other grounds by *United States v. Gigante*, 94 F.3d 53 (2d Cir.1996); *see also Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*, No. 04 Civ. 10014, 2006 WL 1493132, at *6 n.

8 (S.D.N.Y. May 31, 2006) (Leisure, J.) ("Because the Bondholders make this argument for the first time in its reply, the Court will disregard it.").

11. Plaintiffs state in their responses to defendant's first set of interrogatories that their Complaint in this action provided notification of disagreement with certain board decisions. (Pl.'s Resp. to Def.'s Interrog. # 1, Carroll Aff. Ex. 23 at 8.)

12. Those disagreements found in the plaintiffs' expert's report are accompanied by the expert's proposed adjustments to CIGI's financials and the adjustments' effect on the computation of the relevant Combined Ratios. (Carroll Aff. Ex. 24 at 12–23.)

J. at 13.) Thus, where appropriate the Court will address the parties' claims regarding general categories of adjustments. However, for purposes of clarity, the Court will focus its analysis on these six adjustments:

1. Adjustment to eliminate increases in carried reserves for 2000;

2. Adjustment to eliminate increases in premium retentions made by Hannover during 2001;

3. Adjustment based on Hannover's failure to consider certain information in evaluating inter-company expense allocations for both 2000 and 2001;

4. Adjustment based on Hannover's decision to allocate CIGI employee time to the investment function rather than the underwriting function;

5. Adjustment based on Hannover's decision to move fee income from CIGI to another subsidiary in 2001 (the "Acceptance Transaction");

6. Adjustment based on Hannover's handling of calculations in its 2001 financial statements related to a "stop loss" reinsurance treaty (the "Stop Loss Treaty").

(*See* Def.'s Mem. Supp. Summ. J. at 8; Pl.'s Mem. Opp'n Summ. J. at 13.)

## DISCUSSION

The parties do not dispute that this Court retains subject-matter jurisdiction over this action on the ground of the parties' diversity and alleged damages of more than $75,000. *See* U.S. Const. art. III, § 2; 28 U.S.C. § 1332(a)(1), (c)(1) (2000); *St. Paul Fire & Marine Ins. Co. v. Universal Builders Supply*, 409 F.3d 73, 80 (2d Cir.2005).

The Court therefore reviews the applicable legal principles and then turns to the parties' arguments.

## I. *Summary Judgment Standards*

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir.2006). Summary judgment is inappropriate where there exists in the record *any* evidence that could reasonably support a finding in favor of the non-movant. *Id.* District courts must not "'weigh the evidence [or] determine the truth of the matter'"; their only duty is "'to determine whether there is a genuine issue for trial.'" *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir.2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Of course, "'the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'" *Samuels v. Mockry*, 77 F.3d 34, 35 (2d Cir.1996) (quoting *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505). "A genuine issue of fact for trial exists when there is sufficient 'evidence on which a jury could reasonably find for the plaintiff.'" *Cioffi*, 444 F.3d at 162 (quoting *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505).

The moving party carries the burden of demonstrating that no genuine issue of any material fact exists. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir.1994) (Kearse, J.); *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir.1994). In considering whether the burden is met, a court draws all infer-

ences, and resolves all ambiguities, in favor of the non-movant. *See Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir.2006); *Chambers,* 43 F.3d at 36. If a movant has demonstrated that there is no genuine issue as to any material fact, the non-movant "must come forward with 'specific facts showing there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)).

Where, as here, the non-movant bears the burden of proof at trial, summary judgment should be granted if the non-movant fails to "'make a showing sufficient to establish the existence of an element essential to [its] case.'" *Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993) (alteration in original) (quoting *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548); *accord Samuels v. Mockry,* 77 F.3d 34, 36 (2d Cir.1996). The non-movant may defeat summary judgment only by producing specific facts that show there is a genuine issue of material fact for trial. The moving party may overcome this by showing an absence of evidence supporting the non-movant's claim. *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548.

**A. Breach–of–Contract Principles**

■ Under New York law,[13] a plaintiff claiming a breach of contract must make a showing of "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,* 375 F.3d 168, 177

(2d Cir.2004); *accord Harsco Corp. v. Segui,* 91 F.3d 337, 348 (2d Cir.1996) (same); *Republic Corp. v. Procedyne Corp.,* 401 F.Supp. 1061, 1068 (S.D.N.Y.1975) ("The elements of an action for breach of contract are (1) formation of a contract between plaintiff and defendant; (2) performance by plaintiff of any dependent conditions or conditions precedent; (3) defendant's failure to perform; and (4) resulting damage to plaintiff."). Defendant's theory in support of this motion, while not explicit in its papers, is that plaintiffs have failed to satisfy the second required element of their claim, namely, that they have not adequately performed under sections 5(b) and 5(c) of the Letter Agreement. Whether plaintiffs did, in fact, satisfy that element of their claim—that is, whether they adequately performed according to the Letter Agreement—must be evaluated with an understanding of what the parties meant the relevant contract provisions to mean.

■ A court tasked with interpreting a contract should seek "to give effect to the intent of the parties as revealed by the language of their agreement." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.,* 232 F.3d 153, 157 (2d Cir.2000) (Sotomayor, J.). In a breach-of-contract action, summary judgment is appropriate where the language of the contract is "'wholly unambiguous.'" *Mellon Bank, N.A. v. United Bank Corp. of N.Y.,* 31 F.3d 113, 115 (2d Cir.1994); *accord Photopaint Techs., LLC v. Smartlens Corp.,* 335 F.3d 152, 160 (2d Cir.2003) ("Under New York law ... judgment as a matter of law is appropriate if the contract language is

---

**13.** Because the SPA's choice-of-law provision calls for the application of New York law to its terms, such law shall be applied by the Court. *See LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.,* 424 F.3d 195, 205 n. 7

(2d Cir.2005) ("'New York law gives full effect to parties' choice-of-law provisions.'") (quoting *Krock v. Lipsay,* 97 F.3d 640, 645 (2d Cir.1996)).

unambiguous."). "The question of whether a contract is clear or ambiguous is to be decided by the court as a matter of law." *Mellon Bank, N.A.*, 31 F.3d at 115; *accord Cable Sci. Corp. v. Rochdale Vill., Inc.*, 920 F.2d 147, 151 (2d Cir.1990) ("Because in a contract dispute, intent is all, the language used must be examined first to see if it is ambiguous.").

■ A court is justified in finding a contractual term to be ambiguous "where it may be ascribed 'conflicting reasonable interpretations.'" *Rogath v. Siebenmann*, 129 F.3d 261, 267 (2d Cir.1997) (quoting *Mellon Bank, N.A.*, 31 F.3d at 116); *accord Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 257 (2d Cir.2002) ("Contract language is ambiguous if it is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.'" (quoting *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993))). However, the Second Circuit has made clear that summary judgment will not be barred solely due to an ambiguous contract term; to preclude summary judgment relevant extrinsic evidence of the parties' intent must also be present. *See Mellon Bank, N.A.*, 31 F.3d at 116 ("[A]mbiguity itself is not enough to preclude summary judgment. Rather, in order for the parties' intent to become an issue of fact barring summary judgment, there must also exist relevant extrinsic evidence of the parties' actual intent.").

■■ In rare instances, summary judgment will be appropriate where there exists a contractual ambiguity, yet the relevant extrinsic evidence is so one-sided as to compel a finding as a matter of law:

This Court may resolve the ambiguity in the contractual language as a matter of law if there is no extrinsic evidence to support one party's interpretation of the ambiguous language or if the extrinsic evidence is so-one [sic] sided that no reasonable factfinder could decide contrary to one party's interpretation.

*Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 159 (2d Cir.2000) (Sotomayor, J.); *accord Shepley v. New Coleman Holdings Inc.*, 174 F.3d 65, 72 n. 5 (2d Cir.1999) (stating that a court may make a finding that no genuine issue of material fact exists "'not only when the language is unambiguous, but also when the language is ambiguous and there is relevant extrinsic evidence, but the extrinsic evidence creates no genuine issue of material fact and permits interpretation of the agreement as a matter of law'" (quoting *Nycal Corp. v. Inoco PLC*, 988 F.Supp. 296, 299 & nn.9–11 (S.D.N.Y.1997), *aff'd*, 166 F.3d 1201 (2d Cir.1998))); *3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 746–47 (2d Cir. 1999) ("As with any other factual issue, however, the court may resolve ambiguity in contractual language as a matter 'of law' if 'the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide the contrary.'" (quoting *Boston Five Cents Sav. Bank v. Sec'y of Dep't of Hous. & Urban Dev.*, 768 F.2d 5, 8 (1st Cir.1985) (Breyer, J.) (alteration in original))). *See generally* Joseph M. Perillo, *Calamari & Perillo on Contracts* § 3.15, at 164 (5th ed. 2003) ("Where ... extrinsic evidence is introduced, in aid of interpretation of a writing, the question of meaning is left to the jury except where, after taking the extrinsic evidence into account, the meaning is so clear that ... the question is treated as one of law.") (footnotes omitted).

B. *The Implied Covenant of Good Faith and Fair Dealing and the Doctrine of Prevention*

■ Under New York law, "[i]mplicit in all contracts is a covenant of good

faith and fair dealing in the course of contract performance." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 639 N.Y.S.2d 977, 663 N.E.2d 289, 291 (1995); *accord Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir.1992) ("Under New York law, parties to an express contract are bound by an implied duty of good faith...."); *Filner v. Shapiro*, 633 F.2d 139, 143 (2d Cir.1980) (under New York law, "there is an implied covenant of good faith and fair dealing" in every contract). This implied obligation encompasses the performance of " 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included.' " *Dalton*, 639 N.Y.S.2d 977, 663 N.E.2d at 291 (quoting *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 412 N.Y.S.2d 827, 385 N.E.2d 566, 569 (1978)); *accord Bank of China v. Chan*, 937 F.2d 780, 789 (2d Cir.1991) (to violate the implied covenant, the purported bad-faith action "must directly violate an obligation that falls within their reasonable expectations"). It also encompasses the obligation that " 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.' " *Dalton*, 639 N.Y.S.2d 977, 663 N.E.2d at 291 (quoting *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 188 N.E. 163, 167 (1933)); *accord M/A–COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir.1990) (per curiam) ("In general, courts enforce the implied covenant where an implied promise was 'so interwoven in the whole writing' of a contract as to be necessary for effectuation of the purposes of the contract."); *Wakefield v. N. Telecom, Inc.*, 769 F.2d 109, 112 (2d Cir.1985) ("Where, however, a covenant of good faith is necessary to enable one party to receive the benefits promised for performance, it is implied by the law as necessary to effectuate the intent of the parties.").

 However, "[t]he duty of good faith and fair dealing ... is not without limits, and no obligation can be implied that 'would be inconsistent with other terms of the contractual relationship.' " *Dalton*, 639 N.Y.S.2d 977, 663 N.E.2d at 291–92 (quoting *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86, 91 (1983)). Without question, "the implied covenant does not extend so far as to undermine a party's 'general right to act on its own interests in a way that may incidentally lessen' the other party's anticipated fruits from the contract." *Galesi*, 904 F.2d at 136 (quoting *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Pub. Co.*, 30 N.Y.2d 34, 330 N.Y.S.2d 329, 281 N.E.2d 142, 145 (1972)). To prove a violation of the implied covenant of good faith and fair dealing, conclusory allegations of a party's failure to act in good faith alone are insufficient; specific factual allegations of a party's bad faith acts are required. *Prospect St. Ventures I, LLC v. Eclipsys Solutions Corp.*, 23 A.D.3d 213, 804 N.Y.S.2d 301, 302 (App. Div.2005).

 Relatedly, the doctrine of "prevention" stands for the general proposition that "a party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition." *Kooleraire Serv. & Installation Corp. v. Bd. of Educ. of the City of N.Y.*, 28 N.Y.2d 101, 106–07, 320 N.Y.S.2d 46, 268 N.E.2d 782 (1971); *see also Corbin on Contracts* § 947 ("To one who is sued for nonperformance of his promise it is a defense if he can prove that his performance was prevented or substantially hindered by the plaintiff."); Richard A. Lord, *Williston on Contracts* § 63:26 (4th ed. 2006) ("[T]here is generally in a contract subject to either an express or an implied condition an im-

plied promise not to prevent or hinder performance of the contract."). The New York Court of Appeals has described prevention as follows:

A condition precedent is linked to the implied obligation of a party not to "do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Thus, it is a "well-settled and salutary rule that a party cannot insist upon a condition precedent, when its non-performance has been caused by himself."

*A.H.A. Gen. Constr., Inc. v. N.Y. City Housing Auth.*, 92 N.Y.2d 20, 677 N.Y.S.2d 9, 699 N.E.2d 368, 374 (1998) (Kaye, C.J.) (quoting *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87, 188 N.E. 163 (1933); *Young v. Hunter*, 6 N.Y. 203, 207 (1852)); *accord Spanos v. Skouras Theatres Corp.*, 364 F.2d 161, 169 (2d Cir.1966) (en banc) (Friendly, J.) (" 'One who unjustly prevents the performance or the happening of a condition of his own promissory duty thereby eliminates it as such a condition. He will not be permitted to take advantage of his own wrong, and to escape from liability for not rendering his promised performance by preventing the happening of the condition on which it was promised.' " (quoting 3A Corbin, *Contracts* § 767, at 540 (1960))).

▮ Whether the doctrine of prevention or the implied covenant of good faith and fair dealing are at issue, it is clear that to show either, some intent must be proved. The Second Circuit has recently reaffirmed that in cases involving prevention, "[w]here a promisor has no duty to bring about the condition precedent to his promise, only *active* conduct by the promisor to frustrate the occurrence of the condition precedent constitutes waiver of that condition precedent." In re *Bankers Trust Co.*, 450 F.3d 121, 128 (2d Cir.

2006) (per curiam) (emphasis added). A promisor's "passive acquiescence," alone, will not constitute an actionable prevention or hindrance to the promisee's ability to satisfy its condition precedent. *Id.* Similarly, the Second Circuit has held that "[t]he covenant of good faith and fair dealing, implied in every contract under New York law, 'includes an implied undertaking on the part of each party that he will not *intentionally and purposely* do anything to prevent the other party from carrying out the agreement on his part.' " *Kader v. Paper Software Inc.*, 111 F.3d 337, 342 (2d Cir.1997) (quoting *Carvel Corp. v. Diversified Management Group, Inc.*, 930 F.2d 228, 230 (2d Cir.1991)).

## II. The Parties' Claims Regarding the Proposed Adjustments

In its motion before this Court, defendant claims summary judgment is appropriate because it believes that plaintiffs' claims that defendant breached the Letter Agreement by not including various adjustments in its calculation of the Earnout cannot succeed as a matter of law. Defendant's claim is based on its belief that the contractual language of the Special Operating Rules clearly bars any of plaintiffs' claims for adjustments in calculating the Earnout. Defendant believes that plaintiffs' failure to formally and timely object to certain Hannover board decisions constitutes a failure to satisfy dependent conditions or conditions precedent. Defendant therefore believes it did not breach the Letter Agreement in not making plaintiffs' requested adjustments.

Plaintiffs claim summary judgment is inappropriate because there are material factual issues regarding the meaning of the terms of the Letter Agreement, and in particular of the terms of the Special Operating Rules. They therefore claim it is not clear as a matter of law that they

failed to satisfy dependent conditions or conditions precedent. They instead argue that the Special Operating Rules placed no limits on how and when objections to Hannover board decisions could be made, and that therefore any proposed adjustments that fall within the categories specified in the Letter Agreement should have been included in the calculation of the Earnout, regardless of how or when they were raised. Plaintiffs further argue that summary judgment is inappropriate as to those proposed adjustments not covered by the Letter Agreement because they believe defendant violated the covenant of good faith and fair dealing. (Pl.'s Mem. Opp'n Summ. J. at 23.)

The Court will turn first to the parties' claims regarding adjustments that fall within the purview of the Special Operating Rules and the Letter Agreement. It will then turn to the adjustments that fall outside the categories detailed in the Letter Agreement.

A. *Adjustments Pursuant to Section 5(b)*

The parties seem to agree that section 5(b) of the Special Operating Rules is ambiguous as to the mechanics of the disagreement function. Defendant's acknowledgment of this ambiguity is found in its reliance on the extrinsic evidence, rather than the plain language of the contract itself, in making its claims regarding the meaning of section 5(b). Plaintiffs explicitly claim that section 5(b) is ambiguous because it does not speak to how and when a disagreement shall be lodged. Indeed, the provision only states that "if management [i.e., plaintiffs] disagrees with any decision of the board of directors regarding retentions, new programs or inter-company expense allocations, then the effect of such decision shall be eliminated only for purposes of calculating each Shareholder Item." (Letter Agreement 2–3.)

■■ The Court agrees that section 5(b) of the Special Operating Rules, when read in conjunction with the other contract documents, is not "wholly unambiguous," *Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 115 (2d Cir.1994), as to how plaintiffs were required to register a disagreement with certain Hannover board decisions for the purpose of having defendant then exclude those decisions from the calculation of the Earnout. Nowhere do the relevant contracts set forth specific terms as to how and in what manner plaintiffs must register their disagreement. For example, it is unclear whether the disagreement must be made in writing or whether an oral objection is suitable. It is similarly unclear whether the basis for the "disagreement" must be offered, or whether a simple "we disagree" would suffice.

Given the ambiguity of section 5(b) with respect to the mechanics and requirements of the disagreement function of the Letter Agreement, the Court next reviews the relevant extrinsic evidence. If the relevant extrinsic evidence is either so one-sided as to evince only one reasonable interpretation of the provision, or if the non-moving party fails to point to any relevant extrinsic evidence in support of its interpretation, summary judgment may be proper. *See, e.g., Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir.2000) (Sotomayor, J.).

Defendant argues at length that the parties intended plaintiffs to lodge a "formal[ ]" disagreement when they sought to have a decision of the Hannover board excluded from the Earnout calculation. The extrinsic evidence referred to by defendant in support of its motion is the series of written communications plaintiffs

authored to defendant in which defendant claims plaintiffs "formally" objected to certain Hannover board decisions. For example, defendant points to the November 29, 2000, email in which Ferguson told defendant that the Special Operating Rules "contemplate the rather awkward process of the [CIGI] Board voting to increase retentions, with Ralph and I *formally disagreeing*" (Carroll Aff. Ex. 8 (emphasis added)) as decisive proof of the parties' intent to require plaintiffs to "formally" disagree with a board decision. Defendant also points to plaintiffs' use of the word "formal" in its other correspondence with defendant as additional proof of the parties' intent. (*See* Def.'s Mot. Sup. Summ. J. at 11.)

However, while the term "formal[ ]" is used repeatedly, it is neither self-defining nor defined by the parties in any of their correspondence. The only commonality among the extrinsic evidence referenced by defendant is that it was all in writing (and then transmitted either by letter or through e-mail). Defendant seems, then, to be arguing that section 5(b) requires that a "formal[ ]" disagreement to a board decision be in writing, though such argument is not explicitly made. The extrinsic evidence as to this point, however, is not "so one-sided that no reasonable person could decide the contrary." *3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 746–47 (2d Cir.1999) (internal quotation omitted).

Plaintiffs point to evidence they believe raises genuine issues of fact as to whether disagreements had to be made in writing. (*See* Pl.'s Mem. Opp'n Summ. J. at 14–15.) In particular, plaintiffs note that section 5.19 of the SPA explicitly requires plaintiffs to lodge certain disagreements with defendant by written notice within sixty days of receipt of a document with which it disagrees.[14] (SPA 45–46.) In plaintiffs' view, the failure to include a similar written notice requirement in section 5(b) indicates that no such notice was required. (Pl.'s Mem. Opp'n Summ. J. at 15.) Given that the Court "draws all inferences, and resolves all ambiguities, in favor of the non-movant," *see Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315–16 (2d Cir.2006), plaintiffs' line of reasoning does provide the Court with sufficient evidence of genuinely triable questions as to whether the parties intended the disagreement function to require written correspondence. Moreover, simply determining that an objection must be in writing does not provide sufficient detail as to how a disagreement should be lodged; a question remains as to whether some basis for disagreement must be included.

 The parties were clearer, however, as to the time-frame within which a disagreement was to be made. Defendant argues in its moving papers that the parties intended objections to be made prior to the effect of the resulting exclusion becoming known. (Def.'s Mot. Sup. Summ. J. at 17.) In support of this point, defendant points to the language of the examples given in section 5(b) of the Letter Agreement. (Letter Agreement at 3.) The Court does not agree with defendant that the clause it points to is "wholly unambiguous" on its own as to the time frame intended by the parties. For exam-

---

14. This provision is unrelated to the calculation of the Earnout; it deals with plaintiffs' right to disagree with certain calculations made by defendant in other circumstances. It states that in the event of such a disagreement plaintiffs "shall notify ('Objection Notice') [defendant] in writing of such disagreement on or before the 60th Business Day after they receive the relevant schedule or the calculation." (SPA § 5.19; Pl.'s Mem. Opp'n Summ. J. 15.)

ple, it is unclear to the Court how the parties would determine when the effect of an exclusion would be known, especially following the dismissal of Messrs. Milo and Ferguson from their employment.

However, the Court did review extrinsic evidence related to this consideration. In particular, plaintiffs pointed the Court in their complaints (Carroll Aff. Ex. 20 at ¶ 38; Carroll Aff. Ex. 20 at ¶ 34) to a payment date agreed upon in Section X of the Second Amendment to the Employment Agreements appended as Exhibit B to the Employment Agreements. (Carroll Aff. Ex. 1 at Ex. B § 2.) That provision states that Hannover "shall pay all Additional Incentive compensation," which includes any and all Earnout payments, "by May 15, 2002." (*Id.*) In fact, plaintiffs complaint states that "[p]ayment of the Additional Purchase Price [the Earnout] is a function only of the Combined Ratio and the Weighted Combined Ratio, and the due date of May 15, 2002." (Carroll Aff. Ex. 21, ¶ 14.)

Reading this provision in conjunction with the terms of the Special Operating Rules leads the Court to determine that the parties intended for any and all disagreements to be made by plaintiffs prior to May 15, 2002. The Court finds the payment date provision of the Employment Agreements to provide relevant extrinsic evidence so one-sided as to evince only one reasonable interpretation. *See Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir.2000) (Sotomayor, J.).

First, the Court will not interpret the payment-date provision so as to render it meaningless. *See, e.g., Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir.1993) (ambiguity of a contract clause must be determined " 'in the context of the entire agreement[,]' " which allows a court to "safeguard against adopting an interpretation that would render any individual provision superfluous" (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 565 N.Y.S.2d 440, 566 N.E.2d 639, 642 (1990) (Kaye, J.))). When considered in the context of the Special Operating Rules, interpreting the provision to allow a situation where, once the calculations were finalized and the Earnout paid to plaintiffs, disagreements could still be made, would be irrational. Such a reading would render the payment-date provision entirely meaningless.

In addition, the Special Operating Rules of the Letter Agreement support the Court's finding. In the second illustration, the parties contemplated a scenario in which management "may disagree with any of these [inter-company expense] allocations, in which case their effect would not be included *when the Shareholder Items [i.e., the Earnout] are calculated.*" (Letter Agreement 3 (emphasis added).) Because the effect of a disagreement with an inter-company expense allocation would be excluded when the Earnout payment is calculated, the underlying disagreement by plaintiffs would necessarily have to have been made prior to May 15, 2002, when the payment was due.

The Court does note plaintiffs' concern that placing a date restriction on its ability to challenge Hannover board decisions would allow defendant to withhold important information until that date. (Pl.'s Mot. Opp'n Summ. J. at 16.) However, in this particular situation both parties were aware of the May 15, 2002 payment date, agreed to it, and declined to change it at any point in their negotiations. Thus, plaintiffs had every opportunity to request and acquire the relevant information prior to May 15, 2002.

Consequently, except for objections or adjustments that plaintiffs did not timely make because defendants breached the implied covenant of good faith and fair dealing or because defendant prevented them, which will be discussed in greater detail below, plaintiffs' disagreements with Hannover board decisions that were made via their complaint and their expert's report are foreclosed because they were made after May 15, 2002.

As discussed above, neither party has provided a complete list of all of the proposed adjustments at issue in this case. However, the Court has focused on the partial list presented and agreed upon by both parties (*see* Def.'s Mem. Supp. Summ. J. at 7; Pl.'s Mem. Opp'n Summ. J. at 13) for purposes of its analysis. The Court will, therefore, address each of those adjustments that would fall within the purview of Section 5(b) for purposes of determining whether that adjustment is foreclosed by the payment-date provision, or if it might survive due to actions by defendant that breach the implied covenant of good faith and fair dealing or the doctrine of prevention.

i. *Adjustments Related to Increases in Retentions*

Plaintiffs claim defendant caused premium retentions at CIGI to be increased for approximately 25 of 60 programs, and that such increases should have been excluded from calculation of the Earnout. (Pl.'s Mem. Opp'n. Summ. J. at 13.) They make this claim through allegations in their complaint (Carroll Aff. Ex. 20 at 6–7), and also through proposed adjustments noted in their expert's report. (Carroll Aff. Ex. 24 at 12–15.)

Other than the mentions in the complaint and expert's report, the relevant correspondence concerning retentions were (a) a November 22, 2000 fax from defendant, in which plaintiffs were told that defendant was considering increasing retentions, (b) an email in response, sent November 29, 2000, indicating to defendant plaintiffs' concerns that increasing retentions would impact the calculation of the Earnout, (c) the July 17, 2001 letter in which plaintiffs requested a schedule of any changes in retentions for 2001, and (d) defendant's response to that request, sent July 31, 2001. (Def.'s 56.1 ¶ 19.) Because it believes claims in the complaint and in the expert's report do not constitute valid requests for exclusion from calculation of the Earnout, defendant asserts that plaintiffs did not "register an election" to exclude the effects of changes in retentions from calculation of the Earnout. (Def.'s 56.1 ¶ 19(f).)

Given that the only actual objections or proposed adjustments to the Earnout calculation are found in the complaint and in plaintiffs' expert's report, it would appear that plaintiffs' claims regarding retentions are precluded. Plaintiffs do admit that no objections were made to changes in retentions after receipt of the information from defendant in its July 31, 2001 letter, which included a listing of all programs in effect as of January 1, 2001, with the respective retention levels carried by CIGI. (Carroll Aff. Ex. 12.) However, plaintiffs claim that they were unable to object to changes in retentions because the information provided to them by defendant was inaccurate and misleading. (Pl.'s 56.1 ¶ 19; Pl.'s Mem. Opp'n Summ. J. at 11–12, 22.)

While plaintiffs characterize the change in retention levels for the 2000 fiscal year as a breach of the implied covenant of good faith and fair dealing, the Court also has considered whether that these changes, and Hannover's purported non-disclosure of such changes to plaintiffs, are better characterized as preventative actions that hindered plaintiffs' ability to

perform the condition precedent of objecting to the decisions. Regardless of the characterization of defendant's purported actions, however, the key question is whether defendant intentionally misled plaintiffs, making it impossible for them to register objections, in any form, a consideration that applies whether the covenant of good faith and fair dealing or the doctrine of prevention is applicable. *See Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 639 N.Y.S.2d 977, 663 N.E.2d 289, 291 (1995) (" '[N]either party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.' " (quoting *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 188 N.E. 163, 167 (1933))); *Spanos v. Skouras Theatres Corp.*, 364 F.2d 161, 169 (2d Cir.1966) (en banc) (Friendly, J.) (" 'One who unjustly prevents the performance or the happening of a condition of his own promissory duty thereby eliminates it as such a condition. He will not be permitted to take advantage of his own wrong . . . .' " (quoting 3A Corbin, *Contracts* § 767, at 540 (1960))).

■ Still, plaintiffs may only avoid summary judgment by presenting some factual basis for their claims. *Bickerstaff v. Vassar College*, 196 F.3d 435, 452 (2d Cir.1999) ("Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment."). Plaintiffs claim that they were misled as to retention levels is supported by a chart of programs in which Mr. Haas' information differed significantly from the actual level of retentions. (Pl.'s Mot. Opp'n Summ. J. at 11.) This chart was prepared based on information in defendant's expert report. (*Id.*) It provides sufficient evidence that defendant did not provide plaintiffs with information full and complete enough to

allow them to timely object to defendant's decisions for purposes of calculating the Earnout.

Defendant is correct in noting that plaintiffs knew changes in retentions were to be made, (Def.'s Mem. Reply at 6) but did not object. However, there remains a question as to whether defendant actively attempted to mislead or frustrate plaintiffs' ability to object. *See* In re *Bankers Trust Co.*, 450 F.3d 121, 128 (2d Cir.2006) (per curiam) ("Where a promisor has no duty to bring about the condition precedent to his promise, only *active* conduct by the promisor to frustrate the occurrence of the condition precedent constitutes waiver of that condition precedent."). A Court will not find prevention or violation of the implied covenant where a promisor's "passive acquiescence" alone has prevented or hindered the promisee's ability to comply with some condition. *Id.*

■ The Court will not, here, determine if defendants did, in fact, intentionally obstruct plaintiffs' ability to adequately meet their end of the agreement. Nor will the Court go through each individual CIGI program to determine whether defendant's conduct hindered plaintiffs' ability to object as to that program. The Court does, however, find that whether defendant had the requisite intent to improperly prevent plaintiffs from fulfilling their end of the parties' agreement presents a question of fact. Therefore, summary judgment is not appropriate as to plaintiffs' claims regarding retentions for those instances where plaintiffs can show that actions of the defendants prevented or hindered their ability to comply with the Special Operating Rules. The Court notes that plaintiffs' broad claim in its expert's report that complete elimination of any increases in retentions from renewed programs and a 10% reduction in retentions for all new programs is the appropriate adjustment (Car-

roll Aff. Ex. 24 at 12–15) will not stand. As the Court has ruled, objections made after May 15, 2002 are precluded as a matter of law. Instead, plaintiffs will be limited to claims where they can show defendant precluded or prevented them from requesting that specific changes in retentions be excluded from the calculation of the Earnout.

### ii. Adjustments Related to New Programs

The only claim regarding new programs appears to be an objection plaintiffs made in a letter to defendant dated February 5, 2001. Plaintiffs stated that "[t]his letter is to notify you that management objects to the Board's decision to cause Clarendon to enter into the new deal with Acceptance and ICH." (Carroll Aff. Ex. 9; Def.'s 56.1 ¶ 17(a).) The parties disagree as to whether the contents of this letter provide convincing evidence as to a course of conduct or evidence of the parties' intent with respect to notice requirements of the Special Operating Rules. (Def.'s Mem. Supp. Summ. J. at 11; Pl.'s Mem. Opp'n Summ. J. at 18.) The parties agree, however, that this letter does refer to new programs and falls within the purview of section 5(b) of the Special Operating Rules. Thus, as the Court has already found that material issues of fact exist as to what constitutes a disagreement in accordance with section 5(b), and this claim falls squarely within the purview of 5(b) and is not precluded by the payment-date provision, summary judgment is denied as to this claimed adjustment.

### iii. Adjustments Related to Inter–Company Expense Allocations

■ Defendant asserts that plaintiffs' only correspondence concerning inter-company expense allocations was their July 17, 2001 letter in which they requested a schedule of any changes in inter-company expense allocations for 2001. (Def.'s 56.1 ¶ 20.) Plaintiffs disagree with this characterization, and point to their expert report as proof that they did lodge their disagreement with defendant as to inter-company expense allocations. (Pl.'s 56.1 ¶ 21.) As set forth above, the report may not serve as a disagreement under section 5(b) because it was created after May 15, 2002.

As with their claims regarding retentions, though, plaintiffs claim they did not object to changes in inter-company expense allocations after receipt of defendant's July 31, 2001 letter because the information provided to them by defendant was inaccurate and misleading. (Pl.'s 56.1 ¶ 19; Pl.'s Mem. Opp'n at J. 11–12, 22.) Plaintiffs, as required, also provide factual support they believe supports their claim as to these allocations. See Bickerstaff v. Vassar College, 196 F.3d 435, 452 (2d Cir. 1999). Specifically, plaintiffs cite a portion of Mr. Haas' July 31, 2001 letter which they claim misled them as to how inter-company expense allocations were to be calculated for 2001 (Pl.'s Mem. Opp'n at J. 11–12), precluding them from timely objecting to such allocations.

■ If plaintiffs are correct, and can show that Mr. Haas' statement in that letter was an attempt to mislead them as to changes in inter-company expense allocations, then defendant may have violated the implied covenant of good faith and fair dealing. There thus remains a question of fact as to whether defendant actively attempted to mislead or frustrate plaintiffs' ability to object. The Court therefore denies summary judgment as to this claim at this time. Should plaintiffs prevail in showing intent on the part of defendant, plaintiffs' claimed adjustments to calculation of the Earnout may be allowed, despite the fact that plaintiffs did not actually object in a timely manner.

## B. *Adjustments Pursuant to Section 5(c)*

 Plaintiffs admit that they did not comply with section 5(c)'s requirements, (Pl.'s 56.1 ¶ 18; Pl.'s Mem. Opp'n Summ. J. at 22); instead, they argue that those requirements do not prevent them from now objecting to Hannover's decisions concerning reserves. (Pl.'s 56.1 ¶ 18; Pl.'s Mem. Opp'n Summ. J. at 22.) Plaintiffs' argument fails. The text of section 5(c) clearly and unambiguously makes plaintiffs' notice of disagreement to the level of reserves being carried by a Hannover insurance subsidiary a condition precedent to plaintiff's right to disagree, at which point the parties were to undertake the procedure of choosing a neutral third-party expert to establish a level of reserves. Again, the language used by the parties directs the Court's decision: *"If* management disagrees with the level of reserves carried by the Insurance Subsidiaries ..., *then* they may give notice to Hannover Re that they demand a neutral determination of the appropriate level of carried reserves for the relevant period."

(Letter Agreement at 3 (emphasis added).) It goes on to state that "[*i* ]*f* management objects with the level of reserves als [sic] provided above, *then* the level of reserves shall be established by a neutral expert." (*Id.* (emphasis added).) Plaintiffs' right to have a neutral determination of the appropriate level of carried reserves is surely conditional; it only arises after, and "if," plaintiffs first disagree with the level of reserves being carried, which consideration it informs defendant of by demand for a neutral determination.[15]

 Plaintiffs' objection to the level of reserves being carried by CIGI and demand for a neutral determination of the appropriate level of carried reserves under section 5(c) of the Letter Agreement were, then, conditions precedent to the parties actually procuring a neutral third-party to determine the level of reserves to be carried. Plaintiffs did inform defendant of their objection "to the level of carried reserves for the year ending December 31, 2000." (Carroll Aff. Ex. 14.) Plaintiffs did not, however, adequately meet the specific requirements of the condition: plaintiffs

**15.** Plaintiffs characterize the use of a neutral third-party to determine the appropriate level of reserve as prescribed in section 5(c) as an "arbitration process." (Pl.'s Mem. Opp'n Summ. J. 22.) They then distort this characterization by arguing that because they have already brought the instant suit, which includes claims subject to the "arbitration process" of section 5(c), defendant's "proper remedy" with respect to plaintiffs' claims is to move to stay the claim in favor of arbitration. Thus, plaintiffs claim, because this litigation has proceeded, and discovery is now complete, defendant has waived any rights it had to arbitrate a claim under section 5(c).

"The obligation to arbitrate ... remains a creature of contract," [therefore] a party is only subject to arbitration where he has previously agreed to do so by contract. *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.,* 252 F.3d 218, 224 (2d Cir.2001) ("Because arbitrators' authority arises only when the parties agree in advance to that

forum, 'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" (quoting *AT & T Techs., Inc. v. Comms. Workers of Am.,* 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986))). The Court finds that the parties did not intend to arbitrate claims under section 5(c): there is absolutely no mention of adjudicating disputes under section 5(c), or any other provision in the relevant contracts, by "arbitration." *See Progressive Casualty Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela,* 991 F.2d 42, 45 (2d Cir.1993) (Lumbard, J.) ("In determining the arbitrability of a particular dispute, a court must decide 'whether the parties agreed to arbitrate, and, if so, whether the scope of that agreement encompasses the asserted claims.'") (quoting *David L. Threlkeld & Co. v. Metallgesellschaft Ltd. (London),* 923 F.2d 245, 249 (2d Cir. 1991)). Plaintiffs argument, therefore, is rejected.

never demanded a neutral determination of the "appropriate level of carried reserves for the relevant period." (Letter Agreement at 3.) Thus, plaintiffs cannot now fault Hannover unless there is some indication that Hannover somehow improperly impeded plaintiffs' ability to meet the condition.

Plaintiffs claim that defendant breached the implied covenant of good faith and fair dealing with regards to its treatment of reserving practices in 2000. Plaintiffs are correct in pointing out that their ability to object to the level of reserves being carried was naturally subject to the board telling them what the level of reserves to be carried was. This is especially the case because the changes to the level of reserves being held for the 2000 fiscal year were made in April 2001, after Hannover had terminated Ferguson and cut Milo "out of discussions as to business model and detailed accounting." (Pl.'s 56.1 ¶ 65.)

Yet, Ferguson was presented with a draft set of GAAP financials "in or around February 2001." (Ferguson Aff. ¶ 6.) In addition, Anders Larsson, Hannover's CFO, stated in a February 15, 2001 e-mail to Ferguson and Mr. Haas that these draft reserves were going to be changed. Plaintiffs also knew that they had to request additional information from defendants regarding other areas in which they might have disputes, which they did in their July 17, 2001 letter to Mr. Haas. (Carroll Aff. Ex. 11.) Yet they did not, knowing the draft level of reserves was not final and knowing it was in their power to request additional information, seek to further review changes to the levels of reserves when they were made, and, accordingly, object. Consequently, the Court cannot find that plaintiffs' failure to perform a condition precedent—through objection—was due to defendant's frustration or prevention. *Kooleraire*, 320 N.Y.S.2d 46, 268

N.E.2d at 784. Summary judgment as to claims regarding carried reserves pursuant to Section 5(c) of the Special Operating Rules is, thus, granted.

### C. *Adjustments Not Covered by the Special Operating Rules*

Plaintiffs argue that certain actions by Hannover should be considered by the Court even though they are not those types of adjustments specified in the Special Operating Rules of the Letter Agreement. Plaintiffs introduce the following actions by Hannover, which caused the relevant combined ratios to increase. For the 2000 fiscal year: (1) Hannover's reallocation of certain expenses from HFI to CIGI, and (2) its decrease in the allocation of certain employee time to the investment function. For the 2001 fiscal year, (1) defendant's decrease in its allocation of certain employee time to the investment function, (2) defendant's "transfer [of] certain lines of business ... [to] another Hannover subsidiary," and (3) manipulation of the way recoveries under a "stop loss" reinsurance treaty were booked. (Pl.'s Mem. Opp'n Summ. J. at 23–24.)

Plaintiffs admit that none of these claims fall within the purview of the Special Operating Rules of the Letter Agreement, yet they assert that summary judgment is inappropriate as to each. (Pl.'s Mem. Opp'n Summ. J. at 23.) Plaintiff makes this claim on the basis that it believes Hannover "embarked on a campaign to manipulate CIGI's financials in order to prevent the Combined Ratio from being low enough to trigger the earn-out." (Pl.'s Mem. Opp'n Summ. J. at 23.)

Interestingly, plaintiffs did send timely notices of objection as to two of the claims, even though they pertained to areas not covered by the Special Operating Rules. In a September 20, 2001 letter from Ferguson to defendant, Ferguson stated that

he "formally object[s] to any indemnity claim which arises in whole or in part" from the subject transaction and "the inclusion of any loss resulting from the write-off of the reinsurance recoverable associated with the premium portfolio transfer in the calculation of the earn-out." (Carroll Aff. Ex. 15.) Plaintiffs' claim regarding the Acceptance transaction was similarly mentioned in a September 21, 2001 letter, in which Ferguson wrote to defendant to "formally object to any claim which Hannover Re has made against [CIGI]" arising out of certain delinquent reinsurance recoverables and "to the inclusion of any related incurred loss provision for purposes of calculating ... the earn-out." (Carroll Aff. Ex. 16.)[16] The other claims were first introduced in plaintiffs' expert report.

■ As has been discussed above, in order for plaintiffs to show that Hannover violated the implied covenant of good faith and fair dealing, they must show that plaintiffs intentionally did something that has " 'the effect of destroying or injuring the right of the other party to receive the fruits of the contract.' " *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 639 N.Y.S.2d 977, 663 N.E.2d 289, 291 (1995) (quoting *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 188 N.E. 163, 167 (1933)). However, the implied covenant of good faith and fair dealing is not designed to enlarge or create new substantive rights between parties. *Don King Productions, Inc. v. Douglas*, 742 F.Supp. 741, 767 (S.D.N.Y.1990) (Sweet, J.) ("The implied covenant does not, however, operate to create new contractual rights; it simply 'ensures that parties to a contract perform

the substantive, bargained-for terms of their agreement' and that parties are not unfairly denied 'express, explicitly bargained-for benefits.' " (quoting *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F.Supp. 1504, 1516 n. 20, 1517 (S.D.N.Y. 1989))); *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983) ("No obligation can be implied, however, which would be inconsistent with other terms of the contractual relationship."). Moreover, "the implied covenant does not extend so far as to undermine a party's 'general right to act on its own interests in a way that may incidentally lessen' the other party's anticipated fruits from the contract." *M/A COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir.1990) (quoting *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co.*, 30 N.Y.2d 34, 46, 330 N.Y.S.2d 329, 281 N.E.2d 142 (1972)).

■ Plaintiffs here seem to be attempting to create new contractual rights that they did not previously bargain for. Plaintiffs never retained a right to object to intra-company expense reallocations for the purpose of having those decisions excluded from the Earnout calculation. This applies to plaintiffs' claim for the 2000 fiscal year that defendant reduced the percentage of expenses charged by CIGI to its "investment function," which change disadvantaged the Earnout. Plaintiffs concede that this adjustment affected only CIGI's internal expenses and therefore it was an intra-company expense reallocation and not an inter-company expense reallocation subject to disagreement under section 5(b). (Pl.'s 56.1 ¶ 23.) It further ap-

16. The parties spend quite a bit of time in their papers arguing over whether these two communications, along with those others mentioned above, provide evidence of the parties' intentions as to the process by which objections were to be made under section 5(b) of the Special Operating Rules. There is no need to address these considerations for each communication, as the Court has discussed this issue, and determined that genuine issues of material fact exist as to what section 5(b) required of the parties.

plies to plaintiffs' claim that in the 2001 fiscal year defendant directed that allocations of employee time to the investment function be decreased just as they had in 2000. (Pl.'s 56.1 ¶ 78.) Similarly, plaintiffs concede that the claims in both the September 20 and 21 letters do not fall within the types of Hannover board decisions they had a right to object to pursuant to the Special Operating Rules. (Pl.'s Mem. Opp'n Summ. J. at 18.)

Consequently, and for those same reasons set forth above, all of these proposed adjustments are foreclosed as a matter of law. *See Bronx Chrysler Plymouth, Inc. v. Chrysler Corp.*, 212 F.Supp.2d 233, 250 (S.D.N.Y.2002) ("While the implied covenant may be used 'to protect a legitimate, mutually-contemplated benefit' of the contract, a party may not invoke this covenant 'to have [the] Court create an additional benefit for which [the parties] did not bargain ....'" (quoting *Geren v. Quantum Chemical Corp.*, 832 F.Supp. 728, 732 (S.D.N.Y.1993) (alterations in original))). While the Court is sympathetic to the change in circumstances that plaintiffs face as a result of actions taken by Hannover they feel were not in the spirit of the original agreement for the sale of their company, plaintiffs may not now attempt to gain additional benefits from the Letter Agreement. Because plaintiffs have invoked the implied covenant of good faith and fair dealing for the purpose of creating a new right they do not have under their contracts, summary judgment is warranted in favor of defendant as to all of these claims.

## CONCLUSION

For the reasons set forth above, defendant's motion for partial summary judgment is GRANTED as to any claims made by plaintiffs in their complaint or in their expert's report except where plaintiffs show defendant precluded them from making timely objections, GRANTED as to claims brought under section 5(c) of the Letter Agreement, and GRANTED as to claims that do not fall within the specific categories set forth in the Letter Agreement. Defendant's motion is DENIED as to claims regarding retentions where plaintiffs can show defendant precluded them from making timely objections, DENIED as to the "Acceptance Transaction" adjustment requested in plaintiffs' February 5, 2001 correspondence, and DENIED as to claims regarding inter-company allocations where plaintiffs can show defendant precluded them from making timely objections. The parties are ordered to appear before this Court for a pre-trial conference on April 5, 2007 at 9:45 a.m.

**SO ORDERED.**