SECURITY PLANS, INC., formerly known as Creditor Services, Inc., Plaintiff,

v.

CUNA MUTUAL INSURANCE SOCIETY, Defendant.

No. 08–CV–6313L.

United States District Court, W.D. New York.

Sept. 15, 2009.

Jerauld E. Brydges, Harter, Secrest and Emery, LLP, Rochester, NY, for Plaintiff.

Jeffrey J. Harradine, Ward, Norris, Heller & Reidy, LLP, Rochester, NY, Joseph P. Wright, Stafford Rosenbaum, LLP, Madison, WI, for Defendant.

## DECISION & ORDER

MARIAN W. PAYSON, United States Magistrate Judge.

## PRELIMINARY STATEMENT

By order dated September 24, 2008, the above-captioned matter was referred to the undersigned for the supervision of pretrial discovery and the hearing and disposition of all non-dispositive motions, pursuant to 28 U.S.C. §§ 636(b)(1)(A) and (B). (Docket # 5). Plaintiff Security Plans, Inc. ("SPI") has sued defendant CUNA Mutual Insurance Society ("CUNA Mutual") for breach of a contractual provision of an asset purchase agreement between the parties. (Docket # 1). Currently pending before this Court is a motion for a protective order by CUNA Mutual. (Docket # 16). For the following reasons, CUNA Mutual's motion for a protective order is granted in part and denied in part.

## FACTUAL BACKGROUND

### I. *The Contractual Earn Out Provision*

From 1986 to 2003, SPI was a New York insurance agency specializing in the sale of credit life and credit disability insurance to financial institutions, primarily credit unions. (Docket # 1 at ¶¶ 1, 10–13; # 20 at ¶ 4). At the time of the asset purchase, SPI had approximately ninety credit union clients. (Docket # 13 at ¶ 5). CUNA Mutual is an insurance underwriting company that sells credit life and credit disability insurance to credit unions. (*Id.* at ¶ 2). CUNA Mutual operates nationally and annually writes over $600 million in such insurance premiums. (*Id.* at ¶ 3).

On May 31, 2002, the parties executed an asset purchase agreement ("the Agree-

ment"), pursuant to which CUNA Mutual agreed to buy substantially all of SPI's assets, including its customer accounts. (Docket #1 at ¶¶ 13–14, Exhibit ("Ex.") A; #3 at ¶¶ 13–14). CUNA Mutual also agreed to hire SPI's three shareholders for three years to assist in the transition of the business. (Docket #1 at ¶ 14; #3 at ¶ 14). The transaction closed on January 2, 2003. (Docket #1 at ¶ 13; #3 at ¶ 13).

The Agreement also contained an "earn out" provision permitting SPI to earn additional compensation three years after the purchase. (Docket #1 at ¶ 17, Ex. A at ¶ 2.9). Under this provision, CUNA Mutual agreed to pay SPI an additional sum based upon the volume and performance of SPI's transitioned business during the three years following the sale. (Id.). According to Section 2.9 of the Agreement (the "earn out provision"), the compensation was to be calculated using a complex formula based upon two principal variables: (1) a "weighted average of total written premium for the converted credit insurance business"; and (2) a "weighted average for the combined loss ratios [incurred claims [1] divided by earned premium] for the converted credit insurance business." (Docket #1 at ¶ 18, Ex. A at ¶ 2.9(b)(i) and (ii)). CUNA Mutual was solely responsible for setting premium rates and reserves, both of which affect loss ratios and hence the potential earn out due to SPI. (Docket #20 at ¶¶ 7–9). As SPI explains, "the higher CUNA Mutual set reserves for [SPI transitioned business], the higher the loss ratio[,] ... [and the] lower [the] initial calculation of the [earn out] due to [SPI]." (Id. at ¶ 9).

Pursuant to the earn out agreement, CUNA Mutual had the exclusive authority to operate SPI's transitioned business according to CUNA Mutual's "best business judgment." (Docket #1, Ex. A at ¶ 2.9(e)). Specifically, Section 2.9(e) of the Agreement provided:

> Seller acknowledges that Buyer is under no obligation to operate its business after Closing in a manner focused on maximiz-

ing the Earn–Out payable to Seller and may operate the business in accordance with its best business judgment.

(Id.). The agreement capped SPI's potential additional compensation at $2.2 million. (Docket #1 at ¶ 16, Ex. A at ¶ 2.9(b)(iv); #3 at ¶ 16).

At the end of the contractual three-year period, CUNA Mutual refused to pay SPI any additional compensation under the earn out, maintaining that it was not required to do so under the terms of the contract. (Docket #1 at ¶ 32). SPI claims that it is in fact entitled to compensation under the earn out provision. (Id. at ¶ 35).

## II. The Lawsuit and Pending Discovery Dispute

On July 14, 2008, SPI filed the instant suit alleging two causes of action: the first for breach of the contractual earn out provision; the second for breach of the implied covenant of good faith and fair dealing. (Docket #1 at ¶¶ 38–47). SPI alleges that CUNA Mutual set "exceptionally and unreasonably high claim reserves," "employ[ed] inadequate and fundamentally flawed claims processing procedures," "inaccurately or erratically book[ed] written and earned premiums," and "unreasonably failed to re-rate the converted business as originally agreed." (Docket #1 at ¶¶ 33–34; #20 at ¶¶ 10–11). According to SPI, the effect of these actions was to minimize any potential earn out that it was owed. (Docket #1 at ¶ 33).

The pending discovery dispute relates to document requests served by SPI on CUNA Mutual seeking information concerning how it set reserves and calculated loss ratios for other, non-SPI, business. SPI contends that such information is relevant to its claim that CUNA Mutual operated the SPI converted business unreasonably and in violation of the implied covenant of good faith and fair dealing. (Docket #21 at 2). CUNA Mutual objects to the relevance and breadth of SPI's document demands and has filed the instant motion for a protective order prohibiting the

---

1. Incurred claims are comprised of paid claims, pending claim reserves, and incurred but not reported claim reserves. (Docket #20 at ¶ 7).

requested discovery. (Docket # 16). CUNA Mutual asserts that the earn out provision affords it complete discretion in the operation of the SPI converted business and thus precludes SPI from challenging CUNA Mutual's reserve and premium decisions.[2] (Docket # 12 at 4–5).

## DISCUSSION

The threshold requirement of discoverability under the Federal Rules of Civil Procedure is whether the information sought is "relevant to any party's claim or defense." Fed.R.Civ.P. 26(b)(1). To be discoverable, the information "need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* The relevance standard, therefore, is commonly recognized as one that is necessarily broad in its scope in order "to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978) (citation omitted). *See Daval Steel Prods., a Div. of Francosteel Corp. v. M/V Fakredine,* 951 F.2d 1357, 1367 (2d Cir.1991) (parties entitled to discovery of any matter that appears "reasonably calculated to lead to the discovery of admissible evidence"); *Morse/Diesel, Inc. v. Fidelity and Deposit Co. of Maryland,* 122 F.R.D. 447, 449 (S.D.N.Y.1988) (term "reasonably calculated" in Rule 26(b)(1) means "any possibility that the information sought may be relevant" to a party's claim or defense) (internal quotations omitted).

In this case, SPI maintains that the discovery sought is relevant to its claim that CUNA Mutual breached the implied covenant of good faith and fair dealing. (Docket # 21 at 3–7). Specifically, SPI argues that the requested documents provide relevant evidence concerning the question whether CUNA Mutual took actions "in a manner intentionally designed to minimize the [earn out] due to [SPI]." (Docket # 1 at ¶ 44;

# 21). CUNA Mutual disagrees that the discovery is relevant and seeks a protective order prohibiting it. Specifically, CUNA Mutual contends that the breach of the implied covenant claim lacks merit and fails as a matter of law for two reasons. First, CUNA Mutual argues that breach of the covenant of good faith and fair dealing is not a cause of action, but rather a theory upon which a breach of contract claim may be based. (Docket # 12 at 5–6). Second, CUNA Mutual construes the earn out provision to grant it unassailable discretion in operating SPI's former business, and thus to insulate it from any bad faith claims.[3] (*Id.* at 6).

Although SPI does not dispute that the contract gave CUNA Mutual discretion to operate the transitioned business, SPI counters that the covenant of good faith and fair dealing circumscribes that discretion and prevents CUNA Mutual from deliberately depriving SPI of the benefit of its bargain, namely, compensation under the earn out. (Docket # 21 at 7). Stated another way, SPI contends that although CUNA Mutual was not obligated under the contract to maximize the earn out, neither could it intentionally minimize it. (*Id.*).

While ruling on the merits of SPI's claims would be improper in the context of a discovery dispute, neither should the court allow extensive discovery into claims that are clearly foreclosed as a matter of law. *See Collens v. City of New York,* 222 F.R.D. 249, 253 (S.D.N.Y.2004) ("courts should not grant discovery requests based on pure speculation that amount to nothing more than a 'fishing expedition' into actions . . . not related to the alleged claims or defenses") (citing *Tottenham v. Trans World Gaming Corp.,* 2002 WL 1967023, *2 (S.D.N.Y.2002)). *See also In re Subpoena Issued to Dennis Friedman,* 350 F.3d 65, 69 (2d Cir.2003) (federal rules afford district courts broad discretion to manage discovery). In order to evaluate the

---

**2.** As CUNA Mutual reasons, the sole claim that SPI could have asserted, but did not, arising from the earn out provision is one based upon an alleged computational error in the earn out calculation. (*Id.* at 5).

**3.** To date, CUNA Mutual has not moved to dismiss the claim.

relevance of SPI's discovery requests, I must first address the claims at issue in the case.

## I. The Implied Covenant of Good Faith and Fair Dealing Inheres in All Contracts

 "Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 663 N.E.2d 289 (1995); *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir.1994) ("[u]nder New York law, the implied covenant of good faith and fair dealing inheres in every contract") (citing *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co.*, 30 N.Y.2d 34, 35, 330 N.Y.S.2d 329, 281 N.E.2d 142, cert. denied, 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972)). A claim of breach of the covenant is a theory of contractual breach, however, rather than a separate cause of action. *See, e.g., Harris v. Provident Life and Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir.2002) ("[u]nder New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract") (quoting *Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir.1992); *Payday Advance Plus, Inc. v. Findwhat.com, Inc.*, 478 F.Supp.2d 496, 503 (S.D.N.Y.2007) ("a breach of the implied covenant is not a separate cause of action, but is instead one way of establishing a breach of contract"). *See Osan Ltd. v. Accenture LLP*, 454 F.Supp.2d 46, 61 (E.D.N.Y.2006) (granting plaintiff leave to amend complaint, which did not assert breach of contract claim, to add claim for breach of implied covenant of good faith and fair dealing).

 In other words, a breach of contract claim may be predicated upon an alleged breach of the covenant of good faith and fair dealing. *See 1–10 Industry Assoc., LLC v. Trim Corp. of America*, 297 A.D.2d 630, 631–32, 747 N.Y.S.2d 29 (N.Y.App.Div.2002) (reinstating cause of action based on "the plaintiff's allegation that [defendant] acted in bad faith ... depriving the plaintiff of an intended benefit of the letter agreement"). Where

a claim of breach of the implied covenant arises from the same facts as a separate claim of breach of an express contractual provision, however, the former should be dismissed as duplicative. *See, e.g., Harris v. Provident Life and Accident Ins. Co.*, 310 F.3d at 80–81 (citing *ICD Holdings S.A. v. Frankel*, 976 F.Supp. 234, 234–44 (S.D.N.Y. 1997)); *Whiteface Real Estate Dev. and Constr., LLC v. Selective Ins. Co. of America*, 2009 WL 1373735, *1–2 (N.D.N.Y.2009) (citing *Commerce and Indus. Ins. Co. v. U.S. Bank Nat. Ass'n*, 2008 WL 4178474, *3 (S.D.N.Y.2008)).

## II. Purpose of the Implied Covenant

 The implied covenant of good faith and fair dealing ensures that neither party may destroy or injure "the right of the other party to receive the fruits of the contract." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d at 389, 639 N.Y.S.2d 977, 663 N.E.2d 289 (citing *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87, 188 N.E. 163 (1933)). The covenant, however, only protects the bargained-for terms of the agreement and is not "designed to enlarge or create new substantive rights between the parties." *Ferguson v. Lion Holding, Inc.*, 478 F.Supp.2d 455, 479 (S.D.N.Y.2007) (citing *Don King Prods., Inc. v. Douglas*, 742 F.Supp. 741, 767 (S.D.N.Y. 1990)). In addition, "no obligation can be implied that would be inconsistent with other terms of the contractual relationship." *Dalton*, 87 N.Y.2d at 389, 639 N.Y.S.2d 977, 663 N.E.2d 289 (quoting *Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 304, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983)) (internal quotations omitted). Neither may the covenant be construed to "undermine a party's 'general right to act on its own interests in a way that may incidentally lessen' the other party's anticipated fruits from the contract." *M/A–COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir.1990) (quoting *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co.*, 30 N.Y.2d at 46, 330 N.Y.S.2d 329, 281 N.E.2d 142).

 Nevertheless, "[w]here the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that dis-

cretion." *Dalton*, 87 N.Y.2d at 389, 639 N.Y.S.2d 977, 663 N.E.2d 289 (citing *Tedeschi v. Wagner Coll.*, 49 N.Y.2d 652, 659, 427 N.Y.S.2d 760, 404 N.E.2d 1302 (1980)). Thus, "[e]ven when a contract confers decision-making power on a single party, the resulting discretion is nevertheless subject to an obligation that it be exercised in good faith." *Travellers Int'l v. Trans World Airlines, Inc.*, 41 F.3d at 1575 (citing *Carvel Corp. v. Diversified Mgmt. Group, Inc.*, 930 F.2d 228, 231 (2d Cir.1991); *Cross & Cross Props., Ltd. v. Everett Allied Co.*, 886 F.2d 497, 502 (2d Cir.1989)). *But see Century Pacific, Inc. v. Hilton Hotels Corp.*, 528 F.Supp.2d 206, 235 (S.D.N.Y.2007) (acknowledging that discretionary decisions must be made in good faith, but rejecting claim for breach of implied covenant where plaintiffs did not negotiate for a "best efforts" provision or a provision mandating a minimal level of service).

In cases like this in which a party's compliance with a contractual earn out provision is challenged under the implied covenant of good faith and fair dealing, the express terms of the earn out provision are critical to the inquiry. For example, some courts have found that even where an earn out provision does not contain any minimal requirements, the implied covenant will obligate a party to "act reasonably and in good faith in fulfilling the parties' expectations." *T.R. McClure & Co., Inc. Liquidating Trust v. TMG Acquisition Co.*, 1999 WL 692683, *7 (E.D.Pa.1999) (applying New York law); *see also Interwave Tech., Inc. v. Rockwell Automation, Inc.*, 2005 WL 3605272, *11 (E.D.Pa.2005). By contrast, where the provision grants one party the exclusive authority to take, or not take, a certain action affecting the earn out calculation, the implied covenant may not be construed to obligate a party to take or not take that action. *Yarborough v. DeVilbiss Air Power, Inc.*, 321 F.3d 728, 733 (8th Cir. 2003). *See also Ferguson v. Lion Holding, Inc.*, 478 F.Supp.2d at 479–80 (implied covenant may not be invoked to create new contractual rights).

Considering the authority cited above, as well as the absence of any motion to dismiss the cause of action for breach of the implied covenant, I cannot now find that SPI's second cause of action is without merit.[4] That cause of action, as pled, alleges that CUNA Mutual made a series of discretionary decisions—namely, in "setting exceptionally and unreasonably high claim reserves for the relevant businesses"; "employing inadequate and fundamentally flawed claims processing procedures"; "inaccurately or erratically booking written and earned premiums"; and "unreasonably failing to re-rate the converted business as originally agreed" (Docket #1 at ¶33)— that had the effect of minimizing SPI's earn out. (*Id.* at ¶¶33–34, 44). At this stage of the litigation, SPI should be permitted to seek information relevant to its contention that those actions were contrary to CUNA Mutual's contractual obligations, whether those obligations arose from its duty to act in good faith or, as the express language of the earn out provision states, to "operate the business in accordance with its best business judgment." (*See* Docket #1, Ex. A at ¶2.9(e)).

I make this determination without resolving whether, and if so, how CUNA Mutual's express authority to use its "best business judgment" is consonant with or conflicts with its otherwise applicable obligation to act in good faith. *See, e.g., O'Tool v. Genmar Holdings, Inc.*, 387 F.3d 1188, 1195–97 (10th Cir.2004) (upholding judgment for plaintiffs on breach of implied covenant claim where defendants' conduct frustrated plaintiffs' realization of the earn out provision and was not otherwise permitted under the express terms of the agreement); *Greer Props., Inc. v. LaSalle Nat'l Bank*, 874 F.2d 457, 461 (7th Cir.1989) (seller was obligated to act in good faith in deciding to terminate agreement to purchase property even where express provision of agreement permitted it to terminate if cost of cleaning-up property would "in [s]eller's best business judgment" be economically impracticable); *Interwave Tech., Inc. v.*

---

4. Whether that claim should be permitted to proceed as a separate cause of action or simply as a theory of breach need not be decided on this motion. My determination would be the same under either scenario.

*Rockwell Automation, Inc.*, 2005 WL 3605272 at *9–12 (denying defendant's motion to dismiss breach of implied covenant claim where plaintiffs alleged that defendants "took actions specifically to reduce the earn-out amount," despite inclusion in agreement of provision stating that "[defendants] mak[e] no express or implied representations with respect to" the earn out). Thus, I do not determine whether CUNA Mutual, in negotiating the earn out provision, successfully contracted out of the implied covenant or how its business discretion was limited. Neither do I determine what specific fruits of the contract SPI could *reasonably* expect. Rather, the legal relationship between the earn out provision and the implied covenant is an issue best left for the district court to evaluate at a subsequent time on a more fully-developed record.

For the reasons stated above, I determine that information concerning the manner in which CUNA Mutual set its premium rates and reserves and calculated its loss ratios is relevant to SPI's second cause of action. I now turn to CUNA Mutual's objections to the particular document requests at issue in this motion.

### III. Specific Discovery Requests

Having determined that SPI's discovery requests are relevant, the only issue remaining is whether SPI's requests are overbroad or unduly burdensome. A party may move for a protective order in order to limit or prohibit discovery. Fed.R.Civ.P. 26(c). Rule 26(c) provides that the "court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." *Id. See Centeno–Bernuy v. Becker Farms*, 219 F.R.D. 59, 61 (W.D.N.Y.2003) ("once the party seeking discovery has established that the demand seeks relevant information, the burden is upon the party seeking non-disclosure or a protective order to show good cause") (internal quotation omitted) (citing *Dove v. Atlantic Capital Corp.*, 963 F.2d 15, 19 (2d Cir.1992); *Penthouse Int'l, Ltd. v. Playboy Enters., Inc.*, 663 F.2d 371, 391 (2d Cir.1981)).

In responding to CUNA Mutual's motion, SPI has agreed to withdraw Requests Nos. 11, 12, 15 and 16, and has limited the relevant time period for Request No. 17 to January 1, 2005 to the present. (Docket # 20 at ¶¶ 12 n. 1, 18, 19). The remaining requests may be divided into the following four categories.

■ ***Request No. 1:*** SPI seeks all of CUNA Mutual's "group credit life and group credit disability insurance premium rate filings approved by the New York State Department of Insurance from November 1, 1999 to the present" for all of CUNA Mutual's New York accounts. (Docket # 14–2 at 1). CUNA Mutual has provided the requested information for the SPI converted business, but not for the remainder of its New York business. (Docket # 14–2).

SPI contends that CUNA Mutual charged higher premium rates, but reported higher losses, for the SPI-transitioned business than for its other New York business. (Docket # 20 at ¶ 13). SPI maintains that this disparity reveals that CUNA Mutual must have set reserves for its SPI business at unreasonably high levels, eliminating any possibility of an earn out for SPI. (*Id.*).

I find that the documents sought in Request No. 1 are reasonably calculated to lead to the discovery of admissible evidence. The time period covered by the request is too broad, however, and should be limited to the period from January 2003—when CUNA Mutual took over SPI's business—until January 2006, the end of the three-year contractual period to which the earn out provision applies.

■ ***Requests Nos. 4 and 5:*** These requests seek the health statements and statements of insurability that CUNA Mutual used to underwrite its non-SPI New York consumer credit and home equity loans and credit insurance accounts. (Docket # 14–2 at 2–3). According to SPI, the health statements and statements of insurability are underwriting tools used by insurers to evaluate the risk of insuring a particular person and their use affects the insurer's loss ratios. (Docket # 20 at ¶ 14). SPI contends that in order to properly evaluate the reasonable-

ness of the higher loss ratios for the SPI business compared with the loss ratios for the New York non-SPI business, it must examine whether and how CUNA Mutual used these tools in evaluating risks for each business. (*Id.*).

I find that these requests are reasonably calculated to lead to the discovery of admissible evidence, are not overbroad and not unduly burdensome. Therefore, CUNA Mutual's motion for a protective order with respect to Requests Nos. 4 and 5 is denied, except insofar as they request information beyond the three-year contractual period of January 2003 though January 2006.[5]

■ **Requests Nos. 7 and 8:** Requests Nos. 7 and 8 seek information concerning the loss ratios for group credit life and group credit disability insurance for all of CUNA Mutual's non-SPI business in order to enable SPI to compare the loss ratios for SPI's converted business to the loss ratios for comparable business nationwide. (Docket # 14–2). SPI notes that CUNA Mutual is required to regularly provide this information in aggregate form to the insurance department of each state. (Docket # 20 at ¶ 15). CUNA Mutual opposes these requests on the grounds that they are irrelevant and overbroad. (Docket # 23 at 8).

I agree that Requests Nos. 7 and 8 are overbroad and of questionable relevance to the extent that they seek documents relating to loss ratios of business outside of New York state. Regulation of insurance products and services varies from state to state, and thus loss ratios may differ from state to state at least in part as a result of these regulatory differences. (*Id.*). For this reason, as well as the breadth of the information sought, I decline to require CUNA Mutual to produce loss ratio information for business regulated outside of New York. For the same reasons that I have upheld SPI's other requests for information pertaining to CUNA Mutual's other New York business, however, I do direct CUNA Mutual to provide the

requested information for its New York business for the period January 2003 through January 2006.

■ **Request No. 17:** While this request originally sought all documents relating to CUNA Mutual's "Claims Express" system, a claims processing system implemented by CUNA Mutual in 2004 and 2005,[6] SPI has agreed to narrow its request to documents relating to the implementation of the system. (Docket # 14–2 at 7; # 20 at ¶ 19). SPI argues that the requested information is relevant because of a statement that a CUNA Mutual Vice–President made to a trade magazine stating that prior to the implementation of the new claims processing system, the company had been "a little sloppy" in processing claims by its credit union customers. (Docket # 20 at ¶ 16; # 20–4). SPI argues that this statement demonstrates that CUNA Mutual mishandled its claim payments and reserves before the implementation of the new system and that it should be permitted to discover how the alleged problems affected the performance of SPI's converted business and the earn out calculations. (Docket # 20 at ¶ 16).

The purported relevance of the information sought is simply too attenuated to warrant the expansive disclosure that even the narrowed request would require. The statement cited to justify the request does not specify the practices alleged to have been "a little sloppy," how those practices affected, if at all, the factors relevant to the earn out calculation, whether those practices were systemic or isolated, or whether they were confined to a particular geographic region or extended nationwide. Without more information concerning the meaning of the characterization, the request is too expansive to uphold. Accordingly, I grant CUNA Mutual's motion for a protective order with respect to Request No. 17.

### CONCLUSION

For the reasons stated above, CUNA Mutual's motion for a protective order (**Docket**

---

5. The pending motion papers do not reveal the temporal scope of Requests Nos. 4 and 5.

6. While counsel for CUNA Mutual represented at oral argument that this system was implemented

in 2006, it appears that it was implemented in 2004 and 2005 for credit disability and credit life claims, respectively. (*See* Docket # 20–4).

# 16) is **GRANTED in part** and **DENIED in part.**[7] CUNA Mutual is ordered to respond to the outstanding discovery requests within thirty days of the date of this Order. **IT IS SO ORDERED.**

7. This decision is without prejudice to CUNA Mutual's right to negotiate the terms of an appropriate confidentiality stipulation covering some or all of the responsive non-public records if good cause supports the need for such a stipulation.